*E-Filed 5/16/11*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

DEBRA TAYLOR JOHNSON,

        Plaintiff,

  v.

CITY OF OAKLAND,

        Defendant.
_____/

No. C 09-5157 RS

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Debra Johnson filed suit against defendant City of Oakland alleging race and gender discrimination, in violation of Title VII, the California Fair Employment and Housing Act (FEHA), and 42 U.S.C. section 1981. Prior to her retirement, she held the highest civilian position in the Oakland Police Department as the Deputy Director of Police, reporting to the Chief of Police. Shortly before her retirement, the City reached a collective bargaining agreement with the Police Management Association. Pursuant to that agreement, retroactive salary increases were provided to the Deputy Chiefs of Police. While not a member of that bargaining unit, Johnson contends that the City engaged in gender and/or race discrimination when it denied her request for a comparable retroactive salary increase.

## II. RELEVANT FACTS

A.      Creation of the Deputy Director of Police Position

Johnson is an African-American woman. She worked for the City from 1986 until her retirement on November 1, 2008. Her long career began as the Office Manager in the City Clerk's Office. She held a number of positions in that department over the years, including interim Assistant City Clerk, Administrative Analyst in Public Works, Fiscal Services Manager in Public Works, Assistant to the City Manager, and Revenue Manager in the Revenue Administration Unit. In approximately 2004, the then City Administrator Deborah Edgerly decided to create a new management position in the Oakland Police Department (OPD) with responsibility for overseeing the department's budget. Johnson met with both Edgerly and then Chief of Police Richard Word and agreed to accept the position.

Johnson joined the OPD on November 29, 2004 and began performing the duties of the newly created position. She was temporarily classified as Assistant Director of Public Works prior to the formal creation of the Deputy Director of Police position. In December 2006, the City Council passed a salary ordinance amendment that officially created the Deputy Director of Police position. At the time, the salary was set to the same monthly flat-rate salary assigned at the time to the Deputy Chief of Police classification. In proposing the position to the City Council, an Agenda Report was prepared describing the position:

> The new Deputy Director of Police (Non-Sworn) will be the highest level, non-sworn, executive management position reporting directly to the Chief of Police and will align with the Deputy Chief of Police classification. The incumbent will be responsible for overseeing a variety of the administrative functions of a police bureau including fiscal services and personnel management. . . . The proposed salary for this exempt classification is a flat rate of $13,874.23 per month for a 75-hour pay period. The representation unit is U31 [an unrepresented employee unit].
>
> . . .
>
> The alignment of this classification with the sworn Deputy Chief of Police provides authority commensurate with the responsibility and scope of the position. However, as a non-sworn classification, there are significant savings related to the costs of health and welfare benefits.

Johnson served in the Deputy Director of Police position for four years. During this time, she reported directly to the Chief of Police, exercised veto authority over OPD budget issues, and was the head of the Bureau of Administration, one of four Bureaus within the OPD. In her position, Johnson supervised forty-three full-time employees and sixty-seven part-time employees. She was a member of the executive management team, which also included the Chief of Police, the Assistant Chief of Police, and the Deputy Chiefs. She was the only non-sworn member of the management team and the only female. Additionally, there were no female Lieutenants or Captains employed during Johnson's four years with the Department.

B.     <u>Salary Structure in the City of Oakland</u>

Oakland City Council Ordinance Number 12187 establishes employment classifications for City employees and sets a salary schedule for each classification. Council Ordinance 12903 was adopted in December of 2008 and provides further clarification of the 12187 Ordinance, particularly with respect to the City Administrator's authority regarding compensation. Ultimately, an employment classification and its resulting salary are officially authorized only once approved by the City Council. The salary figures actually voted upon by the Council result from another, behind the scenes, process. With respect to represented employees, compensation is typically first bargained for and then reduced to a collective bargaining agreement, or as the parties term it, a Memoranda of Understanding (MOU). The salary agreed upon in the MOU is then submitted to the Council. Unrepresented, civil service exempt employees obviously would not have an MOU, and their salaries are typically recommended by a supervisor and then set by the 12187 Ordinance and amendments made to it. As an example, Ordinance Number 12774 operated as a "salary ordinance amendment," and officially created the position of Deputy Director of Police (Non Sworn). As discussed above, the Agenda Report set compensation at a flat rate and assigned the position to classification unit 31 (that unit groups together various unrepresented management positions).

At the discretion of the City Administrator, unrepresented employees may receive up to, but not more than, the compensation provided for represented employees through MOUs.

Administrative Instruction 501 (AI 501), implemented by former City Manager Henry Gardner, provides that in recommending compensation for unrepresented employees, "consideration will be given to percentage increases received by classes subordinate to the unrepresented class under review." AI 501 identifies an "essential principal" that the base salary of a supervisor "should never be less" than the base salary of a subordinate employee.

Salary increases are available in several forms. A "step increase" is possible where an employee's classification establishes several salary "steps." With the passage of time, the employee may advance among these higher salary steps. (Walsh Decl. ¶ 21.) A "merit increase" is possible for an employee whose classification includes a salary "range" between a minimum and maximum possible salary. (Walsh Decl. ¶ 22.) So long as the employee has not reached the top of his or her range, he or she might receive a merit-based increase, typically upon the recommendation of the employee's supervisor to the City Administrator. Neither type of increase, defendants insist, is available to employees in classifications with flat-rate salaries (presumably, absent an amendment to the salary ordinance approved by the Council). (Walsh Decl. ¶ 23.) A third increase is a cost of living increase (COLA), which is apparently available to all employee classifications.

C.   Denial of Johnson's Request for Retroactive Pay Raises

For approximately two years, from the summer of 2006 until the summer of 2008, the City engaged in contract negotiations and interest arbitration proceedings with the Oakland Police Officers' Association (OPOA). During this period, the City created a new bargaining unit for Police Captains and Deputy Chiefs, the Police Management Association (PMA). Subsequent to the OPOA arbitration, the City negotiated a new collective bargaining agreement with the PMA. The agreement with the PMA took into consideration the OPOA arbitration results, as the City sought to maintain appropriate salary increments among different ranks.

During the prolonged contract negotiations, members of the OPOA and the PMA did not receive any salary increases. The agreement negotiated with the PMA in 2008 included retroactive, across the board, non-discretionary, salary increases for all members of the unit. The increases were retroactive to 2006. The PMA Memorandum of Understanding (PMA MOU) was approved by the

1   City Council in July 2008.  As Assistant Chief of Police Howard Jordan characterized the effect of
2   the MOU, the officers received percentage increases to their base salaries, not merit increases tied to
3   performance or step increases.  As Jordan explained, "[s]uch increases are essentially bargained-for
4   cost of living adjustments (COLAs)."  (Jordan Decl. ¶ 10.)

5   On October 13, 2008, Chief of Police Tucker sent a letter, drafted by Johnson, to City
6   Administrator Dan Lindheim requesting the same salary increase for himself, Assistant Chief
7   Howard Jordan, and Johnson.  He states in the letter that there were "three positions that are part of
8   the Executive staff of the Police Department who are unrepresented and positions are considered a
9   'me too' to the PMA contract."  (Lindheim Decl. Ex. A.)  Tucker requested the retroactive cost of
10  living adjustments (COLAs) dating back to 2006 and 2007 awarded pursuant to the MOU as well as
11  five percent annual "performance increases" dating back to the same time period, according to a
12  theory that the three executives' salaries were also frozen during the OPOA and PMA negotiations.
13  The letter is dated approximately two weeks prior to Johnson's previously announced retirement.  It
14  is not disputed that Jonhson drafted the letter.

15  After receiving the letter from Tucker, Lindheim's initial concern was that Johnson was
16  entitled to receive only civilian COLA increases and therefore was not eligible to receive those
17  awarded to sworn personnel.  He sought input from Director of Finance William Noland.  Noland
18  asked Administrative Services Manager Karen Walsh to research the compensation terms of
19  Johnson's position.  Walsh concluded that the City Council ordinance creating the Deputy Director
20  of Police classification provided a "flat rate salary" for the position, meaning that there were no
21  "step" or "merit" increases associated with the position.  (Walsh Decl. ¶¶ 21-23.)  That ordinance
22  also placed Johnson in unit U31, and she had already received a COLA awarded to that unit during
23  the relevant time period.  (Lindheim Decl. ¶ 10.)  Thus, Walsh concluded that Johnson was not
24  entitled to any further salary increase.  Noland agreed with her analysis and Walsh forwarded a
25  memorandum to Lindheim with her findings.  Lindheim also contacted Personnel Director Marcia
26  Meyers, who similarly concluded that Johnson was not entitled to further increases in salary.  In an

No. C 09-5157 RS
ORDER

5

e-mail sent from Meyers to Lindheim, however, Meyers gave a somewhat different explanation. (Lindheim Decl. Ex. C.)

Johnson does not dispute that the Agenda Report submitted to the City Council characterized her salary as one set at the "flat rate" of $13,874.23 per month for a 75-hour pay period. She does, however, point to a discrepancy in the City's payroll records. Certain of the City's payroll records do indicate that Johnson's salary was to fall between a range of $1,278 to $18,871.44. If this were true, Johnson would be entitled to merit increases up to the top of her range. Indeed, in response to Lendheim's request to research Johnson's request, Meyers stated in an e-mail her belief that Johnson was not entitled to a pay increase because she was already at the top of her "range." In her declaration, Meyers clarified that this was a mistake, that the salary voted upon by the City Council and discussed in the Agenda Report (the flat rate of $13,874.23) is the legally controlling figure. If her salary did indeed have this range, Johnson argues she could have received a merit increase. Even if her salary *was* set at a flat rate, however, Johnson insists there is nothing in the record to suggest that she was ineligible to receive the COLA awarded to the Deputy Chiefs. Failure to award the COLA, Johnson suggests here, would mean that certain subordinates who *did* receive it (namely, two high-earning Captains) would receive a higher base salary.[1]

Johnson also suggests Lindheim considered the salary requests of the Chief of Police and Assistant Chief more favorably than her request. During deposition testimony, Lindheim recalls speaking with Chief Tucker about the PMA agreement and discussing how they would "make sure" he and the Assistant Chief received the COLA increases. Tucker did not receive a salary increase before he retired in February 2009. Lindheim did, however, approve the increase for Assistant Chief Jordan at some point in 2009. As the City explains it, however, this was due to purportedly

---

[1] The parties dispute the correct method for calculating base salary of the police Captains. Johnson's calculation of the Captains' salaries includes non-variable educational incentive pay. The City contends those amount are not part of base pay and that Johnson at all times had a higher base salary than the Captains. Johnson also compares monthly or annual salary and the City maintains that hourly wage is the appropriate metric. Johnson's pay was based on a 37.5 hour work week and the Captains are paid for a 40 hour week. In other words, although Johnson's hourly wage is higher than the Captains', she points out that their salary per pay period is equivalent or potentially higher. The City agrees that this is technically true, but points out that the captains' higher pay period salary reflects more hours worked.

NO. C 09-5157 RS
ORDER

6

"unique" circumstances. Jordan had performed the duties of Assistant Chief for two years before the City Council officially approved that position, and had served as Acting Chief of Police for several months without additional compensation. (Jordan Decl. ¶ 27.) At the time he received the increase, Jordan had also petitioned and received approval from the OPOA board to be included as an associated member.

Johnson argues Lindheim had the authority to grant or deny her request for retroactive salary increases, and she contends that his decision was impermissibly based on race and/or sex discrimination. She brings claims for damages under Title VII of the Civil Rights Act of 1964, section 1981, and the California Fair Employment and Housing Act.

## III. LEGAL STANDARD

In a motion for summary judgment on an intentional discrimination claim, *McDonnell Douglas v. Green* provides the applicable legal framework. 411 U.S. 792, 802 (1973). First, the plaintiff bears the burden of establishing a prima facie case of discrimination by showing: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) similarly situated individuals outside of her protected class were treated more favorably. *See Chuang v. University of California*, 225 F.3d 1115, 1123 (9th Cir. 2000). The burden of production then shifts to the employer to articulate a non-discriminatory reason for the employment action. *Id.* at 1123-24. If the employer can do so, the plaintiff must then show that the proffered non-discriminatory reason is pretextual. She may offer direct evidence that discrimination "more likely motivated the employer" or indirect evidence that the explanation is "unworthy of credence." *Id.* at 1124 (*quoting Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (U.S. 1981)).

## IV. DISCUSSION

A. <u>Johnson's Prima Facie Case</u>

The parties do not dispute that Johnson can demonstrate the first two elements of the *McDonnell Douglas* test: she has alleged illegal discrimination based on her race and gender and her qualifications are not in question. The City, however, maintains that Johnson cannot show that she

No. C 09-5157 RS
ORDER

7

was subject to an adverse employment action or that similarly situated employees outside her protected classes were treated more favorably.

### 1. Adverse Employment Action

First, the City disputes that its decision not to provide Johnson with retroactive salary increases constitutes an adverse employment action. Based on the classification of her position within the U31 unit, the City contends that the only salary increases Johnson was entitled to receive were COLAs approved by the City Council for that unit. Because it has concluded that she was never *entitled* to the retroactive increase, the City insists she cannot rely on its refusal to give her one as an adverse employment event.

While the City contends that Johnson was not entitled to a salary increase without City Council approval, Johnson has introduced evidence that the City Administrator *could* exercise discretion in awarding increases to unrepresented employees in the event that represented employees received increased compensation. According to Johnson, Lindheim's insistence that she was not entitled to salary increases contravenes both his authority to grant raises, pursuant to AI 501, and undermines the City's policy of avoiding salary "compaction." Johnson has introduced a question of fact, in other words, as to whether Lindheim had discretion under AI 501 to award her the same COLA increase awarded to her represented counterparts. This is true even *assuming* Johnson's salary was set at a flat rate. There is no indication in the record that her flat salary precluded her from receiving a COLA (indeed, she received one in 2007). It might also be true that the 2007 COLA she received was less than the amount the Deputy Chiefs received pursuant to the PMA MOU. Johnson has introduced questions of fact as to whether Lindheim *could* have awarded her the increase. Because he did not, there is also at least question of fact as to whether she experienced an adverse employment action.

### 2. Similarly Situated

Second, the City argues that Johnson cannot demonstrate that similarly situated persons outside her protected class were treated more favorably. Consistent with the *McDonnell Douglas* test, Johnson must show that she was similarly situated "in all material respects." *Moran v. Selig*,

No. C 09-5157 RS
Order

8

447 F.3d 748, 755 (9th Cir. 2006). Some difficulty arises in determining who constitutes a class of similarly situated individuals, because of the unique position that Johnson held within the OPD. The question, however, is whether she was similarly situated in respects materially relevant to the employment action at issue, in this case, the retroactive pay increase.

The City would like to compare Johnson to other civilian managers with "purely administrative" duties. It contends that her salary was "at all times" well within the range of salaries received by that group. Johnson does not provide any evidence, defendants point out, that she was treated less favorably than other members of the U31 unit, which includes other civilian deputy and assistant director classifications. Johnson counters that she should be compared to her colleagues and peers, who were the other unrepresented members of the executive management team as well as the Deputy Chiefs of Police.

Johnson's first argument is that she is among three unrepresented members of the executive team who were not covered by the PMA MOU: Chief Tucker, Assistant Chief Jordan, and herself. She contends that Lindheim "approved raises" for Tucker and Jordan, while denying her request. She cites to deposition testimony from Lindheim where he recalls a conversation he had with Chief Tucker. Lindheim stated that they discussed "how we were going to deal with the PMA agreement and how it affected his salary and that of the Assistant Chief." He stated, "we were going to do something about it" and "we talked about that we'd have to make sure that they got the same COLA increases."

While this testimony not does not establish that raises were "approved" for Tucker and Jordan, it does suggest Lindheim supported awarding a COLA increase to the Chief and Assistant Chief. Tucker never actually received the retroactive salary increase. From July 2007 to his retirement in February 2009, his salary remained unchanged. In fact, his last salary increase occurred at the same time Johnson received her last increase. The City admits that Lindheim "did ultimately approve" a salary increase for Assistant Chief Tucker in 2009 that included some of the retroactive increases awarded in the PMA MOU. The increase occurred when the Council adopted a salary ordinance amendment formally creating his classification as "Assistant Chief of Police." The

retroactive increase, the City insists, was designed to remedy the fact that he had not yet been fully compensated for filling the position prior to the date on which it was officially adopted. Thus, while Johnson has introduced evidence indicating that Lindheim was receptive to the requests by the Chief and Assistant Chief for retroactive raises, she has not shown that she was treated differently from the Chief, or responded to the City's explanation that the unique circumstances surrounding Jordan rendered him *not* similarly situated.

Johnson's second argument is that, in not receiving the salary increases, she was denied a raise that was provided to the "similarly situated" Deputy Chiefs of Police. In the salary ordinance amendment creating the Deputy Director of Police position, the salary was set to the same flat rate then received by the Deputy Chiefs of Police. Johnson argues that the intent, at the time the position was created, was to "align" her position with the Deputy Chiefs in terms of prestige, authority, and also salary (as the Agenda Report does state, the position was to "align with the Deputy Chief of Police classification"). Johnson argues that "despite the clear language," Lindheim denied her the pay increase received by male Deputy Chiefs of Police pursuant to the PMA MOU.

The City disagrees that the positions are similarly situated. In its view, there is a substantial difference between the duties of the sworn Deputy Chiefs and the non-sworn Deputy Director. It minimizes the significance of the word "align" in the Agenda Report, insisting that verb is "commonly used" to describe relative reference to other classifications. It argues that the Report cannot be read as guaranteeing the same salary increases for the Deputy Director as the Deputy Chiefs for all time. The Agenda Report refers, for example, to cost savings expected from creating a non-sworn position. The Deputy Director position was placed in a different representation unit than the Deputy Chiefs. Taken together, the City argues there can be no question as to intent: the positions were on different tracks from the start.

Johnson counters that she had the same "reporting responsibilities and accountability" as the Deputy Chiefs. She reported directly to the Chief of Police and was a member of the executive team. Johnson supervised scores of full- and part-time employees, including sworn officers. She possessed veto authority over OPD budget issues. Furthermore, as stated in the Agenda Report, the

No. C 09-5157 RS
ORDER

1 initial "alignment" of the position with the sworn Deputy Chief of Police classification was to
2 provide "authority commensurate with the responsibility and scope of the position." While the City
3 contends that the alignment of the position was not intended to link her salary to the Deputy Chiefs,
4 up until the disputed pay raise, she was paid more than most of them. For purposes of her prima
5 facie presentation, Johnson has provided sufficient evidence to suggest she was similarly situated
6 with respect to the Deputy Chiefs who were provided retroactive salary increases pursuant to the
7 PMA MOU.

B. <u>The City's Non-Discriminatory Explanation</u>

The City advances a number of non-discriminatory explanations for denying Johnson's request for the retroactive salary increase. Foremost, Johnson had announced her retirement and sought the salary increase in mid-October 2008, just prior to her announced retirement date. Providing a retroactive salary increase to her would not serve what the City's describes as the primary purpose of the raises—motivating continuing employees. Instead, the retroactive increase would have had the fiscally undesirable effect of "spiking" her pension. Additionally, the City complains it was experiencing severe budget difficulties at the time. Lindheim contends he would not have provided discretionary raises for that reason alone. Although the City continues to argue that Johnson was not entitled to the raise, and to insist that as a member of the U31 unit, she had *already* received COLA increases for the relevant time period, it contends these two rationales would have prevented Lindheim from exercising any discretion allowed by AI 501 to grant the increase.

C. <u>Pretext</u>

Because the City has proffered legitimate, non-discriminatory reasons for denying the salary increase, Johnson must introduce a genuine issue of material fact as to whether the City's reasons were a pretext for race or gender discrimination. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000). Johnson bears the burden of demonstrating that the City was "more likely" motivated by discrimination or that its explanations are "unworthy of credence." *Chuang*, 225 F.3d at 1124. In order to survive the motion for summary judgment, she must produce "specific,

substantial evidence of pretext." *Coleman*, 232 F.3d 1282 (internal quotations and citations omitted).

### 1. The Retirement Explanation

Johnson argues the City's retirement explanation is "unworthy of credence." She misstates the record, however, when she argues that Chief Tucker received the retroactive pay raise even though he also retired a few months after her. While Lindheim's deposition testimony indicates that he discussed awarding COLA increases to the Chief and Assistant Chief, Tucker received his last raise at the same time Johnson did in 2007. Thus, the City's explanation that it did not want to award the increase to an employee who was retiring is not contradicted by evidence that it treated Tucker differently.

### 2. Financial Situation

Johnson also contends that Lindheim's reliance on the City's financial difficulties is not credible, in light of the fact that all the represented police officers were given COLAs retroactive to 2006. As the City points out, those raises were part of binding arbitration with the OPOA and collective bargaining with the PMA. In other words, the City argues its hands were tied—it had to award the increases to the officers. Although Johnson does not, nor could she, argue that Lindheim was *compelled* by AI 501 to give her the salary increase, she points to the policy espoused there as evidence that he *should* have. AI 501 provides that "consideration will be given to percentage increases received by classes subordinate to the unrepresented class under review." It then identifies an "essential principal" that the base salary of a supervisor "should never be less" than the base salary of a subordinate employee. Without the increase, Johnson argues that at least two Captains who received the MOU increase, but who were her subordinates, would earn base salaries higher than her own. If this is true, Johnson insists there is at least a question of fact as to whether Lindheim's explanation is worthy of credence.

The City disagrees that these two Captains, or any subordinate employee, actually received higher base pay. The dispute centers on the manner in which the parties calculate base salary. Where hourly rates are compared, Johnson plainly earned more than the Captains, even after the

PMA MOU.  Johnson argues, first, that hourly rate is not a fair point of comparison because her position was assigned a 37.5 hour workweek, while the Captains' salaries are based on a 40 hour workweek.  Accordingly, she contends her hourly wage will *always* appear inflated.  Defendants call her argument ridiculous.  If the Captains are paid more per pay period, it is because they work *more hours*.

Next, Johnson suggests the "base" salaries relied upon by the City do not include several "incentive" increases the Captains can reap, such as a premium for higher education or completion of officer training, that were never available to Johnson.  If these incentive increases are considered, the Captains take-home figures do creep up (indeed, because of their ability to earn overtime, Captains can apparently earn far in excess of even the Chief of Police).  Defendants argue it is plaintiff who would unfairly inflate the Captains' salaries, particularly because her position does not require police training and her educational degrees were job requirements (so, presumably, her base salary already rewards her for them).  These are fair arguments and, at least insofar as Johnson's pretext argument relies on a theory that she needed the raise so that her base salary would exceed that of her subordinates, it is not supported by the facts.  Moreover, the fact that the City Administrator would decline to award a discretionary salary increase, as opposed to negotiated ones, is not incredible or unworthy of credence.

### 3. Gender Discrimination "More Likely" Motivated Lindheim?

Johnson also argues there is at least a question of fact as to whether Lindheim's decision was "more likely" motivated by gender or race discrimination.  Johnson notes that there were no other women on the executive team or any women Deputy Chiefs, Captains, or Lieutenants in the OPD during Johnson's tenure.  Although she was promised a car and an office in the Chief's main office, she states that she had trouble obtaining those benefits and ultimately was given a smaller office than her colleagues.  She alleges that the Deputy Chiefs resented her rank and salary and that she was subjected to baseless Internal Affairs investigations during 2006 to 2008.  She therefore

1   contends that, when he denied her salary increases given to similarly situated males, Lindheim
2   engaged in the same discriminatory practices long "prevalent" in the OPD.[2]

3   While the complete lack of other women in the upper ranks of the OPD is brow raising, this
4   evidence still does not create a factual question as to whether Lindheim's decision was "more
5   likely" motivated by discrimination. As an initial matter, Johnson has not identified a nexus
6   between Lindheim and the purportedly sexist individuals within the Police Department. It is
7   undisputed that Lindheim was not a member of the Police Department and did not work in the same
8   building as Johnson or the Deputy Chiefs. The same is true for the Human Resources employees
9   who researched Johnson's salary and reported to Lindheim. Although she *states* that it is likely
10  Lindheim consulted with personnel within the Police Department when preparing his decision on
11  Johnson's request, the evidence shows he talked to Chief Tucker, an individual even Johnson
12  characterizes as her ally. His failure, moreover, to interview *former* employees like Administrator
13  Edgerly also does not suggest a discriminatory motive.

14  To the extent Johnson argues these individuals were independently biased against her, she
15  has also failed to introduce material facts in support. While Johnson points out that all these
16  employees are white, all but Lindheim were women. It is true that all individuals who did receive
17  the retroactive payments were males. It is also true that of the three unrepresented employees who
18  requested the retroactive increases, the only one who received the increase was an African-
19  American male. Of the two who did not receive the increase, one was Johnson. The other was
20  Chief Tucker. One was a woman, the other was a man. Both were set to retire. Beyond assertions
21  that there might be a question of fact as to whether any "white man in America" like Lindheim

---

[2] These allegations did not appear in Johnson's Complaint or in her EEOC complaint, but were raised for the first time in her opposition brief. Defendants argue that the Court may not consider them here, unless it finds that they are "like or reasonably related" to the allegations contained in the EEOC charge. *See, e.g.*, *Green v. Los Angeles County Superintendent of Schs.*, 883 F.2d 1472, 1475-76 (9th Cir. 1989). It is true that the new allegations have a broader reach than those that hail from her formal complaints. She addresses myriad personnel in the Police Department (but does not name them specifically) and discusses events that spanned a four-year period. All the same, her basic point and her theory of the case is the same: she was singled out and denied a benefit on account of her gender and/or her race. Because these facts would not alter the outcome here, consideration of them is at any rate harmless.

might, even if unintentionally, harbor bias against an African American woman, Johnson has not presented either direct or sufficiently concrete circumstantial evidence of pretext.

## V.  CONCLUSION

Despite the City's assertion to the contrary, Johnson establishes a prima facie case of gender discrimination.  Johnson, however, has not met her burden of demonstrating that the City's decision not to award retroactive salary increases was a pretext for discrimination.  Summary judgment for the City is therefore warranted.

IT IS SO ORDERED.

Dated: 5/16/11

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

No. C 09-5157 RS
ORDER

15